[No. 12667.  Department Two.  August 11, 1915.]

E. W. GRIFFIN, *Respondent*, v. UNION SAVINGS AND TRUST COMPANY, *Appellant*.[1]

CORPORATIONS—REPRESENTATION—CONTRACTS—OFFICERS—PERSONAL LIABILITY—EVIDENCE—AMBIGUITY—PAROL EVIDENCE. Where a guaranty of the payment of drafts was written on the letter-head of a bank showing the names of its officers, and was signed "O. B. Woolley, manager," but contained nothing to show that the bank was bound, it is *prima facie* the personal undertaking of Woolley on the theory that "manager" was only *descriptio personae;* but the fact that it was written upon the letter-head and the word "manager" attached, creates sufficient ambiguity to admit of parol evidence to overcome the presumption, the burden being upon plaintiff in an action on the guaranty.

SAME—REPRESENTATION—CONTRACTS—OFFICERS—PERSONAL LIABILITY. The fact that the manager of a bank had no authority to guarantee drafts on behalf of the bank, is some evidence that he did not intend to bind the bank in giving a guaranty on a bank letter-head and appending his official title of "manager" after his signature.

GUARANTY—CONSIDERATION—EVIDENCE — SUFFICIENCY. Consideration moving to a bank for a guaranty, by its manager, of drafts to be made by a mining company, is not shown by a prior agreement made by the manager with two of the persons interested in the mining company, and who were owners of a mill company that was largely indebted to the bank, whereby such owners agreed, upon selling their interests in the mining company to pay over the proceeds of such sale to the bank or its manager; especially where the existence of such agreement was kept secret from the bank's officers, and was not mentioned in the guaranty, and the guaranty was not given because of it.

FULLERTON, J., dissents.

Appeal from a judgment of the superior court for King county, Albertson, J., entered September 4, 1914, upon findings in favor of the plaintiff, in an action on contract, tried to the court.  Reversed.

*McClure & McClure* (*Donworth & Todd*, of counsel), for appellant.

*Wm. Parmerlee*, for respondent.

[1] Reported in 150 Pac. 1128.

ELLIS, J.—This is an action to recover the sum of $2,605.75, the amount of two drafts drawn by the plaintiff, Griffin, on the Chena River Mining Company, payment of which it is alleged was guaranteed by the defendant by a letter of guaranty given to the plaintiff by one O. B. Woolley, who was at that time the manager of the defendant's branch bank at Renton, Washington. The guaranty was written on a letter-head of the branch bank, at the top of which was printed the name of the trust company, the names and the official capacities of its various officers, and Woolley's name, as manager of the Renton branch. The letter was dated at Renton, Washington, June 20, 1912, and, omitting the printed heading, reads as follows:

"E. W. Griffin, Esq.,
        "Fairbanks, Alaska.
    "Dear Sir: This is to guarantee payment to you for any and all drafts drawn by the Chena River Mining Co. upon themselves for an amount not exceeding five thousand—$5,-000.00—dollars. Said drafts are for work to be done on their property between the dates of September 1st, 1912, and June 1st, 1913.          Yours truly,
                    "O. B. Woolley, Manager."

None of the officers of the defendant had any knowledge of the giving of this guaranty, nor any knowledge of Woolley's relations to the mining company.

The circumstances leading up to the giving of the guaranty are briefly these: Griffin, Struthers, Hightower and Woolley, owned the majority of the capital stock of the Chena River Mining Company and were desirous of developing the claims held by that company in Alaska. Woolley was secretary and treasurer of the company with a prospective salary of $6,000 a year. Griffin was a merchant operating a store in the vicinity of the claims, and while in Seattle on his way to Alaska from a trip to the east, he was approached by Struthers and requested to act as Alaska agent for the mining company and to advance funds to

finance the development of the claims. Griffin refused to do this unless indemnified. While Griffin, prior to this time, had no acquaintance with Woolley and claims that he did not know Woolley had any interest in the mining corporation, it seems that he did know that Struthers and Hightower were doing their banking business with the Renton branch of the defendant. Upon being asked by Struthers if the bank's guaranty would be satisfactory to him, he replied in the affirmative. Griffin testified that, on the day he left for Alaska, he telephoned to Woolley at Renton that he wanted the guaranty before leaving. He did not testify that he told Woolley that he required the bank's guaranty or that a personal guaranty would not suffice. Later in the day, Woolley brought to Griffin in Seattle the guaranty above set out, saying as he handed it to him: "Here is this guaranty." Touching what occurred at this time, Griffin testified:

"I don't recall the exact words; I could not say; I don't think we had any talk about it; he simply handed it to me; he probably said, 'Here is this guaranty what I was to give you'; I know I telephoned him that day that I was going away and wanted that guaranty before I left and he promised that he would come right down with it that afternoon, so when he came down he simply handed it to me and said, 'Here is this guaranty'; now, that is my recollection of the circumstances in connection with it."

Griffin left the guaranty with one Shallenberger, his agent in Seattle, and returned to Alaska. Thereafter, from time to time, he honored orders drawn on him by the men in charge of the work on the claims, in the aggregate amount of the two drafts in question, and, to reimburse himself, drew the drafts and sent them to Shallenberger for collection. Shallenberger presented them to Woolley for payment, but Woolley withheld payment at that time in order to secure the approval of Struthers, for the reason that the drafts were drawn on the bank instead of the mining company as agreed. Shallenberger finally procured drafts properly

drawn and presented them to the bank for payment. In the meantime, Woolley had been deposed from his position as manager and the bank refused payment. The plaintiff then brought this action to recover the amount of the drafts from the bank. It was tried by the court without a jury. The court found in favor of the plaintiff and entered judgment accordingly. The defendant appeals.

The appellant contends that the contract of guaranty, if intended to bind the bank, was *ultra vires* and void; that Woolley had neither actual nor apparent authority to bind the bank by this guaranty, and that it was respondent's duty to inquire as to Woolley's authority; and finally, that the contract of guaranty was not executed by or on behalf of the bank, but was on its face the personal contract of Woolley alone, which fact could not be disputed by parol testimony. It is obvious that if this last claim be found correct, it will be unnecessary to consider the others.

It is but fair to the trial court to say that this last point was not very distinctly raised in the court below. It was, however, presented by the pleadings, and there was an objection to the admission of the guaranty in evidence on the ground of incompetency. The question is presented and argued in the briefs on both sides, and the respondent has raised no objection to its consideration here on the ground that it was not sufficiently presented in the court below. We must, therefore, consider it.

It will be noted that the writing itself presents nothing whatever to indicate any connection of the bank therewith, except the fact that it is written upon its letter-head and that the word "manager" is appended to Woolley's signature. The respondent contends, and the trial court seems to have entertained the view, that these two circumstances establish as a fact that Woolley was acting in his capacity as manager and intended to bind the appellant by this guaranty.

The only decision cited as supporting this theory is *People's Bank v. National Bank*, 101 U. S. 181. In that case the guaranty was written below one of the defendant's letter-heads and was signed "M. D. Buchanan, Vice-President." In the guaranty, occurred the following language:

"In accordance with your telegram I herewith hand you ten notes of $5,000 each, &c., . . . We debit your account $50,000. . . . This bank hereby guarantees the payment of the principal sum and interest of said notes."

The notes were also indorsed:

"Pay to the order of the People's Bank of Belleville. Henry E. Picket. This bank hereby guarantees the payment of this note, principal and interest, at maturity. M. D. Buchanan, Vice-President Manufacturers' National Bank of Chicago."

The words, "This bank hereby guarantees," found in both the separate guaranty and in the indorsement, show beyond question that the signer, however defectively the form of his signature expressed that purpose, intended to bind the bank and not himself personally. This alone is sufficient to distinguish the case from that before us. But in addition to this, it also appears that the guaranty was given with the knowledge and consent of the president and cashier of the bank, both of whom were directors, as was also the vice president who signed it. Moreover, the plaintiff's account with the defendant was debited with the full amount of the face of the notes, the defendant thus receiving and retaining the full benefit of the transaction. The court, of course, held that the defendant was estopped to deny that the guaranty was its own. The distinction from the case here is too plain to require further comment.

There are many decisions which hold that the words agent, manager, trustee, treasurer and the like, affixed to the signature of the person who executes a simple contract, when the instrument itself does not clearly indicate that it was

made on behalf of some one other than the signer, are at least *prima facie*, mere *descriptio personarum.* *Pershing v. Swenson*, 58 Minn. 310, 59 N. W. 1084; *Hobson v. Hassett*, 76 Cal. 203, 18 Pac. 320, 9 Am. St. 193; *Barker v. Mechanic's Fire Ins. Co.*, 3 Wend. (N. Y.) 94, 20 Am. Dec. 664; *Gavazza v. Plummer*, 53 Wash. 14, 101 Pac. 370, 42 L. R. A. (N. S.) 1. It is now, however, quite generally held, especially as to unsealed instruments, or where, as here, the use of seals has been abolished by statute, that the question is one of intention, and that the word agent, or any other word indicating a representative capacity, affixed to the name of the signer, when the intent cannot be clearly gathered from the recitals of the instrument itself, imports into the instrument such an ambiguity as to permit a resort to extrinsic evidence to determine the true intention of the parties. *Southern Pac. Co. v. Von Schmidt Dredge Co.*, 118 Cal. 368, 50 Pac. 650; *Smith v. Alexander*, 31 Mo. 193; *Hardy v. Pilcher*, 57 Miss. 18, 34 Am. Rep. 432; *Metcalf v. Williams*, 104 U. S. 93. See, also, note to *Gavazza v. Plummer, supra*, 42 L. R. A. (N. S.) 16. The statement which more nearly harmonizes with the different shades of meaning conveyed in the various decisions than any other which we have been able to find, and which we conceive to be in consonance with the better reasons, is that found in *Pratt v. Beaupre*, 13 Minn. 187, 190, as follows:

"The rule is, that when words which may be either descriptive of the person, or indicative of the character in which a person contracts, are affixed to the name of a contracting party, *prima facie*, they are descriptive of the person only; but the fact that they were not intended by the parties as descriptive of the person, but were understood as determining the character in which the party contracted, may be shown by extrinsic evidence; but the burden of proof rests upon the party seeking to change the *prima facie* character of the contract."

The following decisions voice the same rule: *Rhone v. Powell*, 20 Colo. 41, 36 Pac. 899; *Lewis v. Mutual Life Ins.*

*Co.*, 8 Colo. App. 368, 46 Pac. 621; *Keeley Brewing Co. v. Neubauer Decorating Co.*, 194 Ill. 580, 62 N. E. 923.

The last case cited is also further instructive as showing that the mere use of the letter-head of the supposed principal is wholly insufficient to show an intention to charge the principal, or to dispense with the necessity to resort to evidence *aliunde* to establish the real intention. In that case a proposal was written below the letter-head of the decorating company which read, "We propose, etc.," and was signed by the alleged agent in his own name followed by the words "Mfg. Agt. & Supt. of Contracts." The other party, having accepted the proposal, sought, as here, to hold the decorating company on the contract so created. The court said:

"The words 'Mfg. Agt. & Supt. of Contracts,' following the signature of D. E. Livermore, are mere *descriptio personae.* (*Braun v. Hess & Co.*, 187 Ill. 283.) There is, however, enough uncertainty upon the face of the agreement to admit parol proof of who was intended to be bound as principal (*Vail v. Northwestern Life Ins. Co.*, 192 Ill. 567), and the burden of proof was upon the appellant to show that the Neubauer Decorating Company, and not Livermore, was the principal in the contract. The appellant failed to sustain such burden of proof."

We hold that the guaranty here in question was *prima facie* the personal undertaking of Woolley alone, that the fact that it was written under the letter-head of the appellant and Woolley's official title "manager" was appended to his signature created sufficient ambiguity as to his intention to admit of parol evidence, and that the burden of proof was upon the respondent to overcome by competent evidence the *prima facie* import of the instrument.

A careful consideration of the entire record convinces us that the respondent has not sustained this burden. There is not a word of testimony that Woolley himself intended to bind the appellant by this guaranty or that he was ever asked to give a bank guaranty. Griffin did not testify that

he himself ever at any time told Woolley that he wanted a bank guaranty. Though he testified that he did tell Struthers and Hightower that he would accept a bank guaranty, there is no evidence that either Struthers or Hightower ever requested a bank guaranty from Woolley or told him that Griffin had demanded or expected to receive a bank guaranty. There is nothing in evidence raising an implication that Griffin had any reason, because of any antecedent custom or course of dealing with Woolley or with the bank, to rely upon this instrument as binding the bank. He had never had any dealings with Woolley or with the bank, and there is no evidence that Woolley ever gave to any one on behalf of the bank any guaranty of any kind. There is not a single circumstance in evidence having any reasonable tendency to estop the appellant from disputing liability upon this guaranty. It received no benefit from it, and there is no competent evidence that it was intended, either by Woolley or by any one else, that it ever would receive any such benefit. The evidence is clear that Woolley, as manager of the branch bank, had no actual authority to execute this, or any guaranty on its behalf. While this fact would not be important as binding upon Griffin had the guaranty been so drawn as to be clearly intended to bind the appellant, since Griffin would then have had the right to rely upon the fact that the giving of such a guaranty was within the apparent scope of Woolley's authority as manager, the lack of actual authority is nevertheless important as bearing upon the question of Woolley's intention in giving the guaranty. The very fact that he had no such authority is some evidence that he never intended to bind the appellant by this instrument, *prima facie* his personal undertaking. *Smith v. Alexander*, 31 Mo. 193.

Another circumstance strongly tending to show that the appellant cannot be bound by this guaranty and that there was no intention on Woolley's part that it should be, is found in the fact that it received no consideration whatever for

the giving of the guaranty. It does appear that, at the time
the guaranty was given, the Orillia Lumber Company, a
corporation, doing business in King county, was, and long
had been, heavily indebted to the Renton branch of the ap-
pellant trust company, and that Woolley, by a system of
false bookkeeping, had concealed from the officers and di-
rectors of the appellant the existence of a large part of this
indebtedness. Struthers and Hightower were the sole stock-
holders of the Orillia Lumber Company, and Woolley, ap-
parently in the hope of receiving sufficient money from them
through a sale of the mining claims to discharge this excess
indebtedness, entered into an agreement with them reading
as follows:

"This indenture or agreement made and entered into on
this 13th day of May, 1912, by and between W. E. High-
tower and Fred J. Struthers, each of whom own a one-half
interest in the Orillia Lumber Company and are represent-
ing the Orillia Lumber Company, a corporation, and as par-
ties of the first part, and O. B. Woolley, duly authorized
agent of the Union Savings and Trust Company, a corpora-
tion (Renton branch), party of the second part, Witnesseth:

"That as said party of the first part, the Orillia Lumber
Company, a corporation, is indebted to the Union Savings
and Trust Company in the sum of $. . . . , and that as said
Hightower and Struthers are interested in selling their in-
terests in the Chena River Mining Company, a corporation,
and expect to receive a large sum of money out of the sale
of said mining company, it is hereby agreed: That upon the
sale of said mining company, and in consideration and upon
payment or payments for the sale of said mining property,
that all of the first moneys received for the sale of said prop-
erty shall be turned and paid over to either the Union Sav-
ings and Trust Company, or paid to O. B. Woolley, and that
money to be paid to said party of the second part by said
parties of the first part or their agents until all of said above
sums of money due to said party of the second part shall be
paid in full. And it is further agreed: That parties of the
first part shall not receive any of the moneys paid in said
sale until all of the said sums of money, both principal and

interest, are paid in full and all notes and debts cancelled.
"Witness our hands and the corporate seal of said cor-
porations the day and year first above written.

                         "(Signed)   Orillia Lbr. Co.
                                 "By W. E. Hightower.
                                 "J. Fred Struthers.
                                 "C. B. Woolley."

It is argued that this agreement was made for the benefit
of the appellant and that, therefore, it served as a sufficient
consideration proceeding to the appellant to sustain the giv-
ing of the guaranty here in question.   It must be borne in
mind, however, that this agreement was entered into sometime
before the giving of the guaranty was thought of, and that
its existence, as well as the excessive indebtedness of the
Orillia Lumber Company to the branch bank, was concealed
from the officers of the appellant.   Moreover, this agreement
was also signed by Woolley personally, and was so worded
as to make it of doubtful value to the appellant, except by
the grace of Woolley, even had a sale of the mine been made.
The guaranty here in question makes no reference to this
agreement, and there is not a word of testimony in the record
indicating that the guaranty was given because of this agree-
ment, or that this agreement was ever intended to operate as
a consideration for the guaranty.   We are constrained to
hold that the respondent has wholly failed to overcome by
any competent evidence the *prima facie* import of the guar-
anty as that of Woolley alone.

The judgment is reversed, and the cause is remanded with
directions to dismiss the action.

MORRIS, C. J., MAIN, and CROW, JJ., concur.

FULLERTON, J. (dissenting)—In my opinion the evidence
justifies the conclusion that the guaranty given by Woolley
to the respondent was understood to be, and was in fact, the
guaranty of the appellant bank, and not the personal guar-
anty of Woolley.   For this reason, I dissent from the con-
clusion of the majority.